

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-12-00002-CV

IN THE INTEREST OF M.A.C., A
CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

Appellant G.C. (Father) appeals the trial court's judgment terminating his

parental rights to his daughter, M.A.C.[2]  After a bench trial, the trial court found

that Father had engaged in conduct or knowingly placed M.A.C. with persons

---

[1]See Tex. R. App. P. 47.4.

[2]The trial court also terminated J.W.'s (Mother's) parental rights, but
Mother has not appealed the judgment.

who had engaged in conduct that endangered M.A.C.'s physical or emotional well-being and had knowingly placed or knowingly allowed M.A.C. to remain in conditions or surroundings that endangered her physical or emotional well-being.[3] The trial court also found that termination of Father's parental rights would be in M.A.C.'s best interest. Father challenges the legal and factual sufficiency of the evidence in three issues. We affirm.

## II. Background

In August 2005, the Texas Department of Family and Protective Services (the Department) received a referral concerning Mother's middle child, A.S., because he tested positive for methamphetamines at birth.[4] The Department investigated and determined that there was physical abuse to A.S. and neglectful supervision of M.A.C. because A.S.'s father was a registered sex offender who lived in the home and had access to M.A.C. The Department removed both children from the home. In July 2006, the trial court granted A.W., the maternal grandmother, permanent managing conservatorship of A.S. and M.A.C. and ordered Father to pay child support for M.A.C.[5] Father testified that he had not paid any child support to A.W. but denied that he had been ordered to do so.

---

[3]*See* Tex. Fam. Code Ann. § 161.001(1)(D), (E) (West Supp. 2012).

[4]Father is not A.S.'s father.

[5]The trial court terminated A.W.'s court-ordered relationship with M.A.C. in the judgment in this case, and A.W. has not appealed the judgment.

2

The Department received a referral in February 2011 that there was drug activity occurring inside A.W.'s apartment and that the family was believed to be manufacturing and selling methamphetamines. The referral also stated that eight-year-old M.A.C. was often seen outside the apartment alone as late as 11:30 p.m.

Department investigator Melinda Esquibel testified that she went to M.A.C.'s school after she received the referral. M.A.C. was not in school that day, so Esquibel and law enforcement officials went to A.W.'s apartment. Esquibel and the law enforcement officials knocked, but no one answered. They heard noises inside the apartment and continued to knock until a female voice answered and told Esquibel that she had the wrong address after Esquibel said she was looking for A.W. Esquibel testified that she heard a child crying inside the apartment and that the child said, "[N]o, grandma, no." Law enforcement officials watching the back of the building observed A.W. trying to go out the back door with M.A.C. Inside the apartment, law enforcement officials found syringes, a small amount of methamphetamines, an empty cap of heroin, and empty methamphetamine bags.[6] Esquibel testified that law enforcement officials found nothing inside M.A.C.'s room but that the syringes were found within M.A.C.'s reach on a kitchen counter.

---

[6]The record is unclear as to why law enforcement officials went inside A.W.'s apartment.

3

The Department removed M.A.C. from the home that day. Esquibel testified that the Department considered Father as a placement option, but Father told Esquibel that he did not have a stable environment and that he had a pending assault charge. The Department placed M.A.C. in foster care.

Ashley Moore served as Father's Department caseworker for the 2011 referral. Moore testified that she was initially concerned because Father had not participated in Department services in the past, because Father possibly lacked a relationship with M.A.C. because he was not the primary parent, and because Father had a history of family violence and alcohol abuse.[7]

Father testified that he was arrested for criminal mischief and was issued a citation for assault family violence in June 1997 after he kicked in his mother's VCR. Father also testified that he was arrested in 2000 for public intoxication. In December 2004, Father was arrested for assaulting his mother-in-law, A.W.; he pleaded guilty and was convicted for assault family violence. On April 27, 2011, Father was convicted for assaulting L.S., his girlfriend, and he received one year of community supervision. The terms of Father's community supervision required that he participate in a batterer's intervention program (BIPP); complete eighty hours of community service; attend drug counseling (CATS); and "not have any form of contact, be it in person, by mail, telephone, or any form of

---

[7]Moore testified that Father had not participated in services when M.A.C. was removed in 2005.

4

communication with [L.S.] directly or indirectly for the duration of the supervision term."

Moore developed a service plan for Father and testified that the service plan correlated with his community supervision requirements so that Father would not have to complete duplicate services. Father's service plan required him to submit to drug and alcohol assessments, maintain sobriety, participate in BIPP, and attend individual and family counseling. The service plan also required that Father visit regularly with M.A.C., obtain safe and appropriate housing, abstain from criminal activity, and take responsibility for any prior criminal involvement.

Moore testified that Father initiated counseling but only attended three sessions before he was discharged for non-attendance. Moore also testified that Father did not participate in BIPP and had completed only six hours of community service. Father testified that he told his counselor that he had drinking problems in the past and that the longest he had ever gone without drinking was two weeks. Father testified that he drank three forty-ounce bottles of beer and became intoxicated eight months before trial. He further testified that he had not been intoxicated in eight months and that he had not had an alcoholic drink in two months. Father testified that he is not an alcoholic and that he does not need to attend Alcoholics Anonymous meetings.

Moore testified that L.S. brought Father to visitations and that she called L.S.'s phone to speak with Father. Moore testified that she believed Father lived

5

with L.S. because L.S.'s address was the one listed for Father and because Father previously told Moore he resided with L.S.[8]  Father, however, denied riding with L.S. to attend visitations.  Father testified that L.S. received his calls but that she then contacted Father's cousin who gave Father his messages.  Father then admitted that he violated his community supervision by having telephone contact with L.S.  Father also denied living with L.S. during the case and testified that he lived with his aunt in Grand Prairie at the time of trial and had lived there for one year.

Court-Appointed Special Advocate (CASA) Margie Zentner testified that she met L.S. on June 30, 2011, at a visitation.  Zentner testified that Father was also present at that visit.  Father testified that L.S. had not gone to a visit since the end of April 2011.

Moore testified that she had concerns about Father's ability to provide a stable home for M.A.C. because Father did not have a plan for M.A.C., appeared to be living with L.S., had not addressed his domestic violence issues or his alcohol addiction issues, was unemployed, and appeared to be in violation of his probation.  Moore testified to her opinion that it was not safe to return M.A.C. to

---

[8]Father supplied the court with an address in Irving, Texas, ten months prior to trial.  L.S. lived in Irving.

Father and that Father could not meet M.A.C.'s physical and emotional needs now or in the future.[9]

Moore also testified that she had concerns about Father's relationship with A.W. Specifically, Moore testified that she thought Father would give M.A.C. back to A.W. if he gained custody because A.W. appeared to have control over Father.[10] Moore testified that Father brought A.W. with him to visitations. During the visits, Father was quiet, sat to the side, and did not interact with M.A.C. while A.W. often monopolized the visits. Moore wanted to observe Father at a visit without A.W. present and asked Father to come alone to the December 1, 2011 visit, but he did not comply and brought A.W. with him. Moore also testified that A.W. and Father had contact by phone and visited together throughout the case.

The Department asked that the court terminate Mother's and Father's parental rights, and Moore testified that termination would be in M.A.C.'s best interest. Moore testified that she recommended termination so that M.A.C. could be adopted.[11] CASA Zentner testified that M.A.C. has made it clear that she is

---

[9]Moore testified that in her experience, "domestic violence assaults on family members, is . . . conduct and conditions that endanger[s] the well-being of a child."

[10]Moore also testified that she had contact with relatives who had been asked to take custody of M.A.C. so that A.W. could regain custody of the child.

[11]Based on Moore's relationship with M.A.C. and her observations of M.A.C., Moore believed M.A.C. was ready to be adopted. Moore completed a broadcast and received over forty home studies of families wanting to adopt M.A.C.

ready to move on with her life in a new home. Zentner believes that M.A.C. is "extremely adoptable." Zentner testified that she recommended termination of Mother's and Father's parental rights and that termination would be in M.A.C.'s best interest.

W.B., M.A.C.'s foster mother, testified that, when M.A.C. first came into care in February 2011, she was failing most of her classes and was very hyper, anxious, immature, and unsettled. Since being in W.B.'s home, M.A.C.'s school performance, both academically and behaviorally, has improved; M.A.C. is now on the A-B Honor Roll. W.B. testified that M.A.C. is "really catching up and she knows everything she's supposed to know for her grade level." M.A.C. has become responsible and is a happy child who laughs and giggles a lot.

W.B. testified that M.A.C. did not talk about her parents unless W.B. asked who was at the visits and that M.A.C. returned agitated or sad after some of the visits. W.B. testified that M.A.C. is anxious and wants to be adopted and have a real life.[12] If M.A.C. is adopted, she wants to change her middle and last names. While M.A.C. does not have any medical issues, she takes a small dose of antidepressants, sees a psychiatrist every two months, and attends weekly therapy sessions.

---

[12]M.A.C.'s current foster parents are not considering adopting M.A.C.; W.B. testified that she would like to adopt M.A.C. but that she believes she is too old to be an adoptive parent.

## III. Standards of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may

9

not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also id.* § 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a

10

reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsections (D) or (E) of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## IV. Statutory Endangerment

Father argues in his first and second issues that the evidence is legally and factually insufficient to support the trial court's section 161.001(1)(D) and (E) findings.

## A. Applicable Law

"Endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under section 161.001(1)(D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of the endangerment to the child's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *See id.* at 776–77; *Ziegler v. Tarrant Cnty. Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.).

Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at

12

533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

"To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the child's birth." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied) (citing *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.)). The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g). Even evidence of criminal conduct, convictions, and imprisonment prior to the child's birth will support a finding that a parent engaged in a course of conduct that endangered the child's well-being. *J.T.G.*, 121 S.W.3d at 133.

## B. Discussion

Father argues that the Department placed M.A.C. in foster care because of drug activity in A.W.'s home and that he did not live there and had no knowledge of any illegal drug activity occurring there. Father also argues that his prior family violence convictions were misdemeanors, that he is not an alcoholic, and that his actions have not endangered M.A.C.

The Department responds that Father's parental rights were not terminated for anything that happened while M.A.C. was in A.W.'s custody but were instead terminated for Father's own continuing course of conduct that started in 2005

with the initial removal and continued through the time of trial. The Department points to evidence that Father provided the court with an address in Irving, not Grand Prairie, as his residence ten months before trial; failed to pay any child support for M.A.C.; and failed to complete his service plan. *See In re R.D.*, 955 S.W.2d 364, 368–69 (Tex. App.—San Antonio 1997, pet. denied) (holding parents' failure to financially support the child, giving false information to the court regarding their residence, and failure to attend parenting classes is evidence of their course of conduct that endangered the child's physical or emotional well-being).

Moreover, Father has a conviction for assault family violence against M.A.C.'s maternal grandmother, a citation for assault family violence against his own mother, and another conviction for assault on his girlfriend. This court has held that abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *See In re D.C.*, 128 S.W.3d 707, 715 (Tex. App.—Fort Worth 2004, no pet.); *see also W.S.*, 899 S.W.2d at 776–77.

The trial court also heard testimony concerning Father's alcohol abuse. Father's service plan required him to maintain sobriety; however, Father admitted to getting intoxicated eight months before trial. Father contends there is no evidence that his alcohol use caused any danger to M.A.C.; however, Father's conduct did not necessarily have to be directed at M.A.C., and M.A.C. is not required to suffer injury. *See Boyd*, 727 S.W.2d at 533; *see also In re S.D.*, 980

14

S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied) (explaining that conduct that subjects a child to a life of uncertainty and instability also endangers the child's physical and emotional well-being).  Evidence of alcohol abuse by a parent can support a determination that the parent has engaged in a course of conduct that has the effect of endangering the child.  *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.).

Father focuses only on evidence favorable to his position and minimizes the other evidence supporting the trial court's judgment.  While the evidence is in many respects conflicting, the trial court is the sole judge of the credibility of the witnesses and the weight to be given to their testimony.  *See J.P.B.*, 180 S.W.3d at 573; *see also In re T.N.*, 180 S.W.3d 376, 382–83 (Tex. App.—Amarillo 2005, no pet.) ("[T]he fact finder, as opposed to the reviewing body, enjoys the right to resolve credibility issues and conflicts within the evidence.  It may freely choose to believe all, part, or none of the testimony espoused by any particular witness.").  The trial court could have determined that Father endangered M.A.C. through his history of domestic violence, prior criminal convictions, alcohol abuse, probation violations, failure to pay child support, discharge from counseling, and refusal to address issues in his life that are potentially dangerous or harmful to M.A.C.

Applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the trial court's findings that Father engaged in conduct or knowingly placed M.A.C. with persons who had engaged

15

in conduct that endangered her physical or emotional well-being and that he knowingly placed or knowingly allowed M.A.C. to remain in conditions or surroundings that endangered her physical or emotional well-being. *See* Tex. Fam. Code. Ann. § 161.001(1)(D), (E); *see also H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573. We thus overrule Father's first and second issues.

## V. Best Interest

Father argues in his third issue that the evidence is factually insufficient to support the trial court's finding that termination of his parental rights is in M.A.C.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(2) (requiring clear and convincing evidence "that termination is in the best interest of the child").

### A. Applicable Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

    (A)    the desires of the child;

    (B)    the emotional and physical needs of the child now and in the future;

    (C)    the emotional and physical danger to the child now and in the future;

    (D)    the parental abilities of the individuals seeking custody;

16

> (E) the programs available to assist these individuals to promote the best interest of the child;
>
> (F) the plans for the child by these individuals or by the agency seeking custody;
>
> (G) the stability of the home or proposed placement;
>
> (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and
>
> (I) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted). These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**B. Discussion**

Father points to the strong presumption that keeping a child with her parent is in the child's best interest, and he argues that the Department's "concerns regarding [his] alcohol use and domestic violence are premised upon speculation." Father also points to evidence that M.A.C. was living with A.W. at the time of removal and that he was powerless with regard to making basic parenting decisions.

17

The evidence is discussed in detail above, and we do not repeat it at length here. M.A.C. is doing well in foster care, and she has bonded with her foster family. She has expressed a desire to be adopted and does not wish to keep her father's surname. While M.A.C.'s current foster parents are unable to adopt her, the Department's plan is for M.A.C. to be adopted, and Zentner described M.A.C. as "extremely adoptable."

In contrast, Father has a history of domestic violence and alcohol abuse. The trial court also heard evidence of his community supervision violations. Father was discharged from counseling for non-attendance and has not participated in the domestic violence treatment program. Father also has not paid child support. In addition, Father turned down M.A.C. living with him in 2011. In short, Father has continually refused to take the steps necessary to address his anger and alcohol abuse, despite being on notice that his parental rights could be terminated for failure to do so.

Viewing the entire record and giving due deference to the factfinder's findings, we conclude that the evidence is such that the trial court could reasonably form a firm belief or conviction that termination of Father's parental rights is in M.A.C.'s best interest. *See H.R.M.*, 209 S.W.3d at 108. We therefore hold that the evidence of M.A.C.'s best interest is factually sufficient to support the judgment, and we overrule Father's third issue.

## VI. Conclusion

Having overruled each of Father's issues, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL:  GARDNER, WALKER, and MCCOY, JJ.

DELIVERED:  October 11, 2012